**BRADFORD TRUST COMPANY OF BOSTON, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.**

No. 81 Civ. 3409 (JES).

United States District Court,
S.D. New York.

Nov. 14, 1985.
As Amended Dec. 9, 1985.

Louis J. Maione, New York City, Christopher J. Collins, of counsel.

William T. Marshall, Jr., Jeffrey T. Letzler, New York City, for defendant.

## OPINION AND ORDER

SPRIZZO, District Judge:

The following Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## BACKGROUND

Plaintiff, Bradford Trust Company of Boston ("Bradford"), is a corporation organized and existing pursuant to the banking laws of Massachusetts, with its principal place of business in Boston. In its regular course of business, Bradford acts as a trust company, custodian, trustee and/or transfer agent for various and sundry mutual funds and money market funds. Defendant, Merrill Lynch, Pierce, Fenner and Smith ("Merrill Lynch"), is a corporation organized under the laws of Delaware, with its principal place of business in New York. It acts as a broker in securities, as a dealer in corporate and municipal securities, and as an investment banking firm.

In 1979, Stanley E. and Marjorie P. Allen ("the Allens") were the owners of two mutual funds administered by Bradford as shareholder servicing agent for the sponsor of the funds, Massachusetts Financial Services Company. On October 28, 1979, Bradford received a letter from the Allens requesting that, contrary to previous instructions given by them, the dividends accruing in the two mutual funds be reinvested in new shares of the fund. Accompanying the letter was a yellow form which reflected the changed status of the funds. The Allens' address of record on that date was in Spain. *See* Pre-Trial Order ("PTO") at 4, ¶ 8.

On or about November 8, 1979, Bradford received an undated letter, purportedly from the Allens, instructing Bradford to liquidate the funds and remit the entire proceeds therefrom to the Allens at a new address in Geneva, Switzerland. The signatures on the letter were not guaranteed. *See id.* at ¶ 9. An undated stock power, which purportedly bore the signatures of the Allens and a signature guarantee stamp of Merrill Lynch, and which the plaintiff alleges was endorsed by defendant's employee, David P. Kleber, was processed with that letter by Bradford. Other than the purported signatures and the guarantee stamp, as well as the pre-printed material on the form, the stock power was blank in all respects. *See id.* at ¶ 10; Plaintiff's Exhibit ("PX") 5. The aforementioned two documents were sequentially numbered and microfilmed when processed by Bradford. *See* PTO at 5, ¶ 11. Bradford made no effort to verify the requested change of address and the signatures on both the letter and the stock power, or to compare the signatures with other specimens of the Allens' handwriting which were in its possession. *See id.* at ¶ 12.

The following day, November 9, 1979, Bradford liquidated the mutual funds, issued two checks, one in respect of each fund, and forwarded the proceeds to the

"Allens" at the Swiss address. *See id.* at 6, ¶ 14.

On or about December 17, 1979, the two checks were presented to Banque Internationale a Luxembourg ("BIL") by Aris Khavessian, a customer of BIL. The checks were transmitted for collection to First National Bank of Boston ("FNBB"), the correspondent bank of BIL, on or about December 18, 1979. FNBB sent the checks to Bradford, as the drawee bank, for collection on December 24, 1979. *See id.* at ¶ 17.

On January 4, 1980, an employee of FNBB inquired of Bradford as to why the two checks had not yet been paid. Bradford indicated that the original checks had not been received from FNBB. Photocopies of the checks, with prior endorsements guaranteed by FNBB, were requested and sent to Bradford as replacements. The original checks were subsequently located. *See id.* at 6–7, ¶¶ 17–18. On January 8, 1980, Bradford paid FNBB the appropriate sums representing the funds and, thereafter, FNBB credited the account of BIL. *See id.* at 7, ¶ 21.

On January 14, 1980, BIL issued to Khavessian a check, drawn on Chase Manhattan Bank, New York, New York, in the amount of $181,692.85. Following the receipt of the check, Khavessian requested and received, in lieu of the check, a cash payment of an equivalent amount in Belgian francs. *See id.* at ¶ 22.

On or about January 17, 1980, Bradford discovered that an apparent imposture had occurred when the "real" Allens made inquiry as to the status of the funds. Bradford then compared the endorsement of the Allens on the FNBB checks to the signatures which Bradford had on file and determined them to be different. Thereafter, Bradford began correspondence with the Allens to determine whether the original redemption request had been a forgery. *See id.* at 8, ¶¶ 23–24. Bradford reimbursed the two funds of the Allens, with interest, in the amount of $212,159.01. *See id.* at 8, ¶ 27.

On June 3, 1981, Bradford initiated the instant action against Merrill Lynch based on breach of warranty in respect of the signature guarantee, and negligence. This case was tried before the Court without a jury.

## DISCUSSION

### I.

Bradford alleges that it relied on the signature guarantee of Merrill Lynch and therefore was damaged as a result of the defendant's negligence, misrepresentation and/or breach of warranty in guaranteeing the purportedly forged signatures on the stock power.

The validity of a security, the effectiveness of registration by the issuer, and the rights and duties of the issuer with respect to registration or transfer are governed by the law (including the conflict of law rules) of the jurisdiction of the issuer. *See* New York Uniform Commercial Code § 8–106 (McKinney, 1984 Supp.); Mass. Gen.Laws Ann. ch. 106, § 8–106 ("Massachusetts Uniform Commercial Code § 8–106") (1976). The issuer, Bradford Trust, is organized and exists pursuant to the banking laws of Massachusetts, with its principal place of business in Boston, and the funds were issued in Massachusetts. Hence, because seemingly all of the most significant contacts occurred there, the law of Massachusetts should be applied in this case. *See National Shawmut Bank v. International Yarn Corp.*, 322 F.Supp. 116 (S.D.N.Y.1970); *Electric Welding Co. v. Prince*, 195 Mass. 242, 255, 81 N.E. 306, 310 (1907).[1]

---

1. The law of the state with the most significant contacts should be applied. *See National Shawmut Bank, supra,* 322 F.Supp. at 120. Since the Court has been directed to no recent Massachusetts authority directly applicable to this issue, and because New York has enacted essentially the same relevant provisions of the Uniform Commercial Code, *compare* Massachusetts U.C.C. §§ 3–307, 8–106 *with* New York U.C.C. §§ 3–307, 8–106, the Court will refer when necessary to appropriate New York authority.

■ By examining the applicable provisions of the Uniform Commercial Code and relevant case law, it is clear that the threshold issue common to all of the plaintiff's claims is whether the signatures of the Allens on the blank and undated stock power, *see* PX 5, were forged. In the present case, Bradford has the burden of establishing that the Allens' signatures on the stock power were forged. *See Watertown Federal Savings & Loan Association v. Spanks*, 346 Mass. 398, 193 N.E.2d 333 (1963); *622 West 113th Street Corp. v. Chemical Bank New York Trust Co.*, 52 Misc.2d 444, 276 N.Y.S.2d 85 (N.Y.Civ.Ct. 1966).[2] Indeed, counsel for the plaintiff acknowledged at trial that an essential element of Bradford's claim was that the purported signatures of the Allens on the stock power were not genuine. *See* Tr. at 23–24, 29, 30.[3]

■ Section 3–307(1)(b) of the Massachusetts Uniform Commercial Code provides that "the signature is presumed to be genuine or authorized." Until some evidence is introduced which would support a finding that the Allens' signatures on the stock power, purportedly guaranteed by Kleber, were forged or unauthorized, Merrill Lynch, as the alleged guarantor, is not required to prove that the signatures were authentic. *See* Massachusetts Uniform Commercial Code § 3–307, Official Comment 1 (1976). It is incumbent upon a party claiming the non-genuineness of a signature to produce firsthand proof of the forgery. *See, e.g., Freeman Check Cashing, Inc. v. State of New York*, 97 Misc.2d 819, 412 N.Y.S.2d 963, (N.Y.Ct.Cl.1979); *see also Pee Dee Production Credit Ass'n*

*v. Joye*, 284 S.C. 371, 326 S.E.2d 650 (1984).[4]

■ The record before the Court is devoid of competent evidence as to whether the Allens' signatures on the stock power are genuine or forged. The plaintiff failed to depose the "real" Allens or to call them at trial as witnesses. A handwriting expert was not called, nor were any handwriting exemplars offered. Apparently there exists only a sworn affidavit, purportedly signed by the "real" Allens, in which they state that they did not authorize the liquidation of their accounts. *See* PTO at 8, ¶ 25. Although it is questionable whether that hearsay evidence in itself would be sufficient to meet plaintiff's burden of proof on this issue, the plaintiff did not bring even this affidavit before the Court. Bradford's failure to prove this essential element of its case is fatal to its claims against Merrill Lynch. *See Freeman, supra*, 97 Misc.2d at 822, 412 N.Y.S.2d at 966.

**II.**

Moreover, even assuming arguendo that the Allens' signatures on the stock power were shown to be forgeries, Bradford has failed to establish that it was reasonable for it to rely upon the signature guarantee on a blank stock power which offers no description of the items to be transferred or liquidated. Although there was testimony by Manuel Hernandez, Senior Vice President in charge of the Massachusetts Financial Service Center, that a stock power in a mutual fund does not normally "come filled in,"[5] *see* Hernandez deposition at 42,

---

**2.** The issuer may recover from the broker who guaranteed the owner's signature if the signature is not genuine. *See Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 479 (6th Cir.1973).

**3.** At the trial, the following exchange took place: THE COURT (addressing plaintiff's counsel): But I take it you would agree that the lack of genuineness—the question of genuineness is relevant to the case because if the signature was in fact genuine, right, then you would have no loss [for which] you could look to them on the guaranty.

MR. MAIONE: That's right.
*See* Tr. at 29.

**4.** The evidence needed to prove that a forgery occurred could have been provided by the testimony of a qualified expert or by a witness to the execution of the endorsement. *See Freeman, supra*, 97 Misc.2d at 822, 412 N.Y.S.2d at 965.

**5.** The following exchange took place at the Hernandez deposition:

Q: *Normally it comes filled in?*
A: No. In a mutual fund, unlike stock transfer, you don't transfer. In order to sell you

normal procedure in the transferring of securities dictates that the signature of the endorser should appear on the back of the security or on a separate document which "(i) sufficiently describe[s] the security (e.g. by certificate number); and (ii) contain[s] words of 'assignment and transfer,' 'power to assign and transfer,' or both." *See* C. Israels and E. Guttman, *Modern Securities Transfers,* § 5.02 at 67 (1971). The stock power in question, therefore, should have at least included a description of the security to be transferred. *Cf. Edgerly v. First National Bank of Boston,* 292 Mass. 181, 197 N.E. 518 (1935) (holding that the delivery of a stock certificate, which was endorsed in blank and accompanied by a separate document signed by the owner purporting to assign unnamed stock to an unnamed person, is not valid for transfer to a bank of that stock certificate as security for a loan).

Furthermore, the allegedly forged letter of instruction which supposedly accompanied the stock power did not bear the signature guarantee stamp of Merrill Lynch, and no one compared, as a matter of procedure, the signature on the stock power, which bears what appears to be a signature guarantee stamp, with the letter of instruction. *See* Hernandez deposition at 40–41. Therefore, it cannot be fairly inferred that, at the time the liquidation was effected, any employee at Bradford had a reasonable basis to believe that the signatures on the allegedly forged letter of instruction and those set forth on the stock power were in fact the same.

## III.

Bradford also failed to establish that, in fact, the Merrill Lynch employee, David Kleber, signed the guarantee stamp on behalf of Merrill Lynch, thereby failing to prove that that stamp was genuine and valid. The plaintiff offered two FBI reports, which offered the hearsay opinion that Kleber had indeed signed the guarantee on the stock power and that his fingerprint was also on the stock power. *See* PX's 8, 9. At trial, the Court stated that, since it was a non-jury trial, the Court would admit these arguably inadmissible FBI reports into evidence, but stressed that it would give them no weight as competent proof of the genuineness of the Kleber signature on the stock power. *See* Tr. at 20–21.[6] Notwithstanding the Court's admonition, plaintiff never called the author of the FBI report as a witness, nor did it secure the testimony of any other expert witness, *cf. Amburn v. State of Tennessee,* 553 S.W.2d 922, 926 (Tenn.Crim.App.1977).[7] Thus, plaintiff has failed to prove, by a preponderance of the credible evidence, that the signature guarantee stamp was genuine and signed by David Kleber as agent for Merrill Lynch.

## IV.

Bradford, in its post-trial submission, has requested, nine months after trial, either a *nunc pro tunc* amendment of the Pre-Trial Order to reflect as an undisputed fact that a forgery occurred, or a continuance of the trial so that it may offer evidence to prove

---

don't have to transfer from one individual to another. In a mutual fund the company buys back a stock or its shares, the mutual fund itself, that is why it doesn't have to be filled, it just has to be signed and guaranteed. Hernandez deposition at 42.

6. THE COURT: I can tell you right now I am not disposed to give very much weight and we are at trial so I can tell you, *I am not disposed to give very much weight to the opinion of an expert, even if I admit it, which is not subject to cross-examination....* So I think you need not worry about the hearsay objection for the moment. It's overruled. I think the rules permit me to take it in my discretion and I will take it

in my discretion, but *I note for the record that I will not give it very much weight. In fact, I don't think I'll give it any weight.* See Tr. at 20–21 (emphasis added).

7. Expert witnesses may compare authenticated specimens of handwriting with disputed writings to determine whether the disputed writing has been forged. If the expert concludes that the document is a forgery, the expert can compare it with authenticated writings to determine the identity of the person who forged it. The expert's testimony in both instances is admissible in evidence to prove not only that the document was a forgery, but the identity of the forger. *See Amburn, supra,* 553 S.W.2d at 926.

the non-genuineness of the Allens' signatures. *See* Bradford Trust Company of Boston's Memorandum of Law in Support of Plaintiff's Contention that a Forgery Occurred ("Bradford Forgery Memo") at 1–2. In point of fact, the Court recognized the issue of the genuineness of the Allens' signatures as a disputed issue at the outset of the trial, *see* Tr. at 2, and that issue was addressed by the Court again during the course of the trial. *See id.* at 22–24. On neither occasion did counsel for Bradford betray any surprise. Instead, it was readily agreed that forgery was an issue to be tried. *See id.* at 23–24.

Moreover, even assuming arguendo that the forgery issue was not set forth as disputed issue in the Pre-Trial Order—a view which the Court does not accept—there would be no proper basis for affording the relief requested. Where, as here, one party refers briefly to an issue not contained in the Pre-Trial Order and the opposing party does not object or request adjournment, the Court may properly consider that issue. *See Bucky v. Sebo,* 208 F.2d 304 (2d Cir.1953). During the trial of the instant case, counsel for the defendant stated clearly that Merrill Lynch had not stipulated that the Allens' signatures were forged. *See* Tr. at 23–24. The plaintiff's counsel failed to object, contradict that statement, or request an adjournment. In addition, counsel for the plaintiff readily agreed with the Court and the defendant that the key issue was forgery. *See id.* at 23–24, 29–30. Therefore, Bradford can be deemed to have consented to the presentation of this issue. *See Bucky, supra,* 208 F.2d at 305.

Furthermore, there is no support for plaintiff's claim that it justifiably believed that the forgery issue was included as an undisputed fact in the Pre-Trial Order. In the Pre-Trial Order, the only undisputed fact that even remotely deals with any alleged forgery of the signatures on the stock power is contained in paragraph 25.[8] A fair reading of that paragraph shows clearly that no stipulation as to the forgery was made, and the Court therefore did not construe that paragraph as such at trial. *See* Tr. at 23–24.[9] Moreover, other portions of the Pre-Trial Order make it clear beyond any doubt that the forgery issue was the main issue to be tried. For example, in the Pre-Trial Order, the following issue was set forth in the "Factual and Legal Issues" section:

"2. Whether Bradford may seek relief under the signature guarantee in question."

PTO at 9.

This issue encompasses the question of whether there was a forgery of the Allens' signatures, and refutes Bradford's claim that that issue was not in dispute. Plaintiff's right to recover based upon the defendant's guarantee of the signatures set forth in the stock power was contingent upon the fact that the signatures guaranteed were not genuine. Plaintiff's counsel's claim that he justifiably believed that the issue of the forgery was not a disputed fact at trial is, therefore, untenable.

■ Plaintiff's belated request to reopen the trial to present additional evidence on the forgery issue must be denied. The reopening of a case after both sides have rested is a matter within the sound discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S.

---

8. Paragraph 25 of the Pre-Trial Order reads: Affidavits of forgery were *apparently* later executed by the Allens, averring that the two checks which were endorsed and, thereafter collected through FNBB and presented to Bradford for collection by FNBB, were never received by either of the Allens. (emphasis added).

9. THE COURT: Well, that's a legal question. I mean, I take it an element of your case is, is it not, that there was a forgery here?

MR. COLLINS: Yes
THE COURT: The guaranty—
MR. MARSHALL: That has not been stipulated to.
THE COURT: I didn't read that as a stipulation. What's stipulated to is the fact that someone claimed there was a forgery.
*See* Tr. at 23–24.

321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). However, the Court should not utilize its discretion to grant such relief unless the interests of justice require it, nor should any party be afforded such relief where it has not carried its burden of establishing that its failure to produce the evidence which it now seeks to offer was not the result of its own lack of diligence. *Cf. Reconstruction Finance Corp. v. Commercial Union of America Corp.,* 123 F.Supp. 748 (S.D.N.Y.1954). Very little purpose would be served by requiring adequate and timely trial preparations and Pre-Trial Orders if a party could be afforded such relief absent a showing of due diligence.

■ Plaintiff has not discharged that burden. It should have been plain to plaintiff from the outset that the forgery issue was a vital question in this case, for the reasons noted above. However, plaintiff made no effort to depose the Allens prior to trial, nor did Bradford ever seek to obtain the assistance of a handwriting expert to establish the forgery of the Allens' signatures by competent proof.

Moreover, even though at the trial itself the Court stressed that forgery was a crucial issue, plaintiff never at that time sought an adjournment to submit proof on that issue. This failure is especially tell-ing, since in connection with plaintiff's purported reliance upon certain FBI reports to establish the genuineness of the signature of defendant's employee Kleber on the signature guarantee, the Court made it plain to plaintiff that such testimony would not be regarded as persuasive proof.

Given all these circumstances, it would be an abuse of discretion for this Court to allow plaintiff leave to reopen. Plaintiff has failed to show any diligence in procuring evidence of forgery, and its claim of unfair surprise is not supported by the Pre-Trial Order or the record at trial.[10]

## CONCLUSION

For all the foregoing reasons, plaintiff has failed to prove that the signatures at issue were forgeries, that it reasonably relied upon the blank stock power, and that the signature guarantee stamp was genuine and valid. Judgment must be entered for the defendant. Leave to reopen is denied. Plaintiff's complaint is dismissed with prejudice.

It is SO ORDERED.

---

**10.** Moreover, even assuming arguendo that the plaintiff is given leave to establish the forgery of the Allens' signatures, it would not inevitably follow that plaintiff would be entitled to relief against defendant. While it is true that a person to whom a signature guarantee has been given ordinarily has the right to rely upon that signature guarantee, it is not entirely clear that such reliance is sufficient to justify a verdict for a plaintiff under circumstances such as those presented in this case. "The underlying theory which justifies reliance on the guarantee of signature is that while *the issuer cannot verify the genuiness of a signature* ... the guarantor of signature will be someone sufficiently familiar with it...." Israels and Guttman, *supra,* § 11.-01 at 158 (emphasis added).

In the usual situation in which a signature guarantee is relied upon, the plaintiff has no other basis upon which to test the genuineness of the signature. In this case, the Allens were plaintiff's own customers and, indeed, their genuine signature specimens were on file and accessible to plaintiff. The plaintiff made no effort to compare the Allens' purported signatures on the instruction letter or the stock power with their presumably valid signatures contained in its own file. In fact, barely one week before its receipt of the allegedly forged letter, plaintiff had received and processed papers which bore the Allens' valid signatures and indicated their new address in Spain. *See* PTO at 5, ¶ 12. Under these circumstances, notwithstanding the general proposition of law with respect to signature guarantees referred to above, it appears to this Court that plaintiff's injury resulted more from its own negligence than from any conduct of the defendant.

Thus, the Court is not persuaded that the interests of justice require that plaintiff be afforded the relief requested because, even assuming that Bradford is given leave to prove the forgery, it appears that plaintiff may well have failed to sustain its burden of establishing by a preponderance of the evidence that defendant's conduct was the proximate cause of its injury.